268 N.J. Super. 337 (1993)
633 A.2d 985
ROBERT MORGAN, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
UNION COUNTY BOARD OF CHOSEN FREEHOLDERS; MICHAEL J. LAPOLLA, INDIVIDUALLY; GERALD B. GREEN, INDIVIDUALLY; BRIAN FAHEY, INDIVIDUALLY; JOSEPH SULIGA, INDIVIDUALLY; ADOLPH D. SARRO, DIRECTOR OF DEPT. OF GOVERNMENTAL PROPERTY AND INDIVIDUALLY, DEFENDANTS-RESPONDENTS/CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 1993.
Decided November 16, 1993.
*346 Before Judges PETRELLA, BAIME and VILLANUEVA.
Linda B. Kenney argued the cause for appellant/cross-respondent (Ansell, Zaro, Bennett, Kenney & Grimm, attorneys; Ms. Kenney, on the brief).
*347 Paul L. Kleinbaum argued the cause for respondents/cross-appellants Union County Board of Chosen Freeholders and Gerald B. Green (Zazzali, Zazzali, Fagella & Nowak, attorneys; Mr. Kleinbaum and Stephen E. Trimboli, of counsel and on the brief; Kathleen M. Connelly, on the brief).
Peter L. Korn argued the cause for respondent/cross-appellant Brian Fahey (McDonough, Korn & Eichhorn, attorneys; Paul L. Kleinbaum and Stephen E. Trimboli, of counsel and on the brief; Kathleen M. Connelly, on the brief; Mr. Korn, of counsel and on the supplemental brief; Anthony M. Tracy, on the supplemental brief).
Bradford Bury argued the cause for respondent/cross-appellant Adolph Sarro (Bury & Associates, attorneys; Paul L. Kleinbaum and Stephen E. Trimboli, of counsel and on the brief; Kathleen M. Connelly, on the brief).
Stephen E. Trimboli argued the cause for respondent/cross-appellant Michael LaPolla (Genova Burns, attorneys; Mr. Trimboli and Paul L. Kleinbaum, of counsel and on the brief; Kathleen M. Connelly, on the brief).
Edward J. Kologi argued the cause for respondent-cross-appellant Joseph Suliga (Mr. Kologi, attorney; Paul L. Kleinbaum and Stephen E. Trimboli, of counsel and on the brief; Kathleen M. Connelly, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Plaintiff Robert Morgan instituted this action in the Law Division, contending that he was wrongfully terminated from his position as Director of the Union County Division of Buildings and Grounds by reason of his political affiliation. Although plaintiff resigned from his position, he asserted that he had been constructively discharged. Named as defendants were the Union County Board of Chosen Freeholders, Michael LaPolla, Gerald Green, Brian Fahey, Joseph Suliga and Adolph Sarro. The gist of the *348 nine count complaint was that the defendants conspired to deprive plaintiff of his civil rights by terminating his employment because of his membership in the Republican party. Plaintiff sought compensatory and punitive damages as well as injunctive and declaratory relief.
Prior to trial, the Law Division dismissed plaintiff's claims for infliction of emotional distress and various due process violations. The court also dismissed plaintiff's claim for violations of the Optional County Charter Law (N.J.S.A. 40:41A-86 to -87), and his demand for injunctive and declaratory relief. The court denied defendants' motions for summary judgment as to plaintiff's remaining causes of action. Following the completion of plaintiff's case, the court granted defendants' motions for an involuntary dismissal.
Plaintiff appeals and defendants cross-appeal. In the principal appeal, plaintiff argues that the Law Division erroneously dismissed his claims for emotional distress, due process and Optional County Charter Law violations prior to trial. He further contends that the trial court erred by granting defendants' motions for an involuntary dismissal respecting his federal civil rights and wrongful discharge actions. Plaintiff also attacks several of the trial court's evidentiary decisions. In the cross-appeal, defendants argue that plaintiff failed to comply with the notice provisions of the Tort Claims Act (N.J.S.A. 59:8-1 to -11), that they had the right to discharge plaintiff because political affiliation was an appropriate job requirement, and that they were immune from suit. They assert that the Law Division thus erred by denying their motions for summary judgment.
Because of the unwieldy nature of the principal and cross-appeal, we consider these arguments in chronological order. First, we are in complete accord with the Law Division's pretrial rulings. Specifically, plaintiff's claims for intentional infliction of emotional distress, due process violations and violations of the Optional County Charter Law were properly dismissed before trial. In a similar vein, defendants' motions for summary judgment *349 on the remaining causes of action were correctly denied. Second, we are convinced that the trial court erred by granting the individual defendants' motions for an involuntary dismissal at the close of plaintiff's case. Giving plaintiff the benefit of all favorable testimony and legitimate inferences, the jury could reasonably find that the individual defendants conspired to deprive Morgan of his federal constitutional rights. We conclude that the trial court committed error by aborting the trial and dismissing plaintiff's claim for compensatory and punitive damages. As to the Union County Board of Chosen Freeholders, the record is barren of any officially sanctioned act depriving plaintiff of his civil rights. The trial court properly dismissed plaintiff's claim against the Board.

I.
After a 37 year career with Public Service Electric and Gas Company, plaintiff retired in 1987 at the age of 60. Plaintiff had long been a Roselle Park councilman, where he served as the chairman of the Township's committees on buildings and grounds, public works and finance. Through his association with the Republican party, plaintiff learned of an opening in the County's Division of Buildings and Grounds. After an interview with the County Manager,[1] Donald Anderson, plaintiff, the only applicant, was hired as the Director of the Division. Under the administrative hierarchy, plaintiff reported to William Anderson, the Director of Public Works. Sarro served as Supervisor of Trades under plaintiff's direction. Richmond LaPolla, Michael's brother, was plaintiff's assistant. The record indicates that plaintiff received excellent evaluations and was often praised by members of the Board of Chosen Freeholders.
Plaintiff presented evidence indicating that his problems began when the Democrats won a bitterly contested election in November *350 1987 and assumed control of the Board. Suliga was among the newly elected freeholders. Fahey and LaPolla, also Democrats, had been in office since 1984. Donald Anderson testified that he was initially confronted by Fahey in LaPolla's office shortly after the election and was criticized for not "fir[ing] anybody." Fahey named three employees he wanted terminated apparently for political reasons. After Fahey left, Anderson expressed his concern to LaPolla who explained that the freeholders intended to restructure the Division of Buildings and Grounds and elevate it to departmental status. LaPolla noted that plaintiff would not be appointed director of the department but would be retained at a lower level. Despite LaPolla's assurances, Fahey allegedly ordered Anderson to terminate plaintiff's employment. Anderson refused to execute this order notwithstanding Fahey's "insisten[ce]."
Anderson advised plaintiff of the restructuring plan at a meeting on or about February 15, 1988. At trial, their respective recollections of this conversation differed. According to plaintiff, Anderson asked him to resign because he "was too important to the Republican Party to hold [an upper-level] position." When plaintiff suggested that he might refuse, Anderson allegedly replied, "I have a gun to my head" and "I'll have to fire you." Anderson denied that he threatened to terminate plaintiff or that he mentioned his political affiliation.
Following this meeting, plaintiff described his version of the conversation to a newspaper reporter. Fahey allegedly told Anderson that he would attempt to suppress the newspaper article, but if he were unsuccessful, Anderson would be required to fire plaintiff immediately. Fahey allegedly concluded the discussion by noting that he would have "charges" against plaintiff "put together" and would "chop him to bits." Shortly thereafter, a newspaper article appeared, reporting that Anderson had told plaintiff he "had a gun held to [his] head" and that the freeholders had ordered Anderson to terminate plaintiff's employment. Anderson resigned in April 1988.
*351 Later in 1988, the new Department of Governmental Properties was created and Sarro, plaintiff's former subordinate, was appointed Director. According to plaintiff, the position was never advertised or posted, and Sarro's deposition testimony indicated that he was appointed by Ann Baron, the acting County Manager. Sarro immediately removed plaintiff from his private office and assigned his secretary to Richmond LaPolla. Plaintiff testified that he was shunned by all members of the department and was excluded from all his former job functions. Sarro repeatedly disparaged plaintiff, telling him that he was "the only damn [R]epublican here[,]" and asking him why he "d[idn't] retire" and "get out." Sarro admitted during his deposition that he excluded plaintiff from attending budget meetings, handling disciplinary proceedings and interviewing, and evaluating employees. Sarro explained that he assumed plaintiff wished to retire.
Joseph Martin was appointed County Manager in 1988. After the election that year, only one Republican remained on the Board. Green, a Democrat, was elected a freeholder. In December 1988, Fahey and Green met with Martin at Fahey's office. Martin "was handed a pad and ... given a list of names." Fahey and Green ordered Martin to terminate plaintiff's employment. Plaintiff's "political affiliation was mentioned" as a reason for his termination. Martin recalled that "the freeholders ... suggest[ed] rather strongly" that plaintiff be "remove[d] ... as Director of Buildings and Grounds." Both freeholders urged Martin "to demonstrate that [he] was a team player." Martin testified that he subsequently looked at the list that had been given him and to the extent that he recalled party affiliation he indicated that all employees who were to be fired were Republicans and all replacements were Democrats.[2] Martin could think of no reason for terminating plaintiff and, thus, took no action.
In March 1989, the Budget Director and Finance Director presented Martin with a list of twenty positions to be eliminated. *352 Plaintiff's position was on the list. The list apparently referred to positions held by both Democrats and Republicans. According to Martin, it reflected an "intramural war among the Democrats." However, Paul O'Keefe, the lone Republican remaining on the Board, criticized Fahey for recommending "the abolition of jobs without the tacit consent of the majority of the Board[,]" and for subjecting county employees "to retaliation and retribution because the majority ... [felt it] ha[d] a score to settle." According to O'Keefe, although the list referred to members of both parties, "it was predominantly ... [R]epublican."
Plaintiff complained to Martin concerning the diminution of his responsibilities. Martin's general response to plaintiff was to "go back and do [his] job." However, Suliga criticized Martin on the basis that he was "sending the wrong message" and "creating strife by telling [plaintiff] to [return to] his job." Martin was repeatedly criticized for not being "on the same team" with the freeholders. Plaintiff recalled a subsequent conversation with Suliga where Suliga said, "[w]hy the hell don't you get the hell out of here? ... We don't want you ... The [D]emocrats don't want you in here. Get out." Suliga's statements were echoed by Sarro who told Martin that they "were working in a political environment," and Martin was "naive" if he believed the freeholders were not interested in personnel actions.
Martin testified that freeholders Fahey, Suliga and Green often commented about plaintiff's "political affiliation," pressuring him "to solve the Bob Morgan problem." Suliga allegedly "pushed" Martin to take action, and Fahey stated that plaintiff "should go as head of Buildings and Grounds because he was a Republican." However, Martin refused to terminate plaintiff's employment because he "found [him] to be capable" in the performance of his job. Martin testified that he resigned in March 1990, noting that "the freeholders were happy to see [him] go."
Plaintiff was on sick leave from February 5, 1990, to April 2, 1990, during which time he underwent heart surgery. When he returned from his hospitalization, Sarro immediately assigned him *353 to inspect "all sixteen floors [of the courthouse]," including every room, bathroom and stairwell. Plaintiff was concerned because the assignment required him to climb the stairs to all sixteen flights in order to inspect the stairwells. Although plaintiff had often directed employees to inspect various parts of the courthouse, he regarded Sarro's instructions as compelling him to personally perform the assignment. Plaintiff objected to Sarro's order, noting that he had returned from his hospitalization only that day. Sarro then contacted the County's personnel director and ordered plaintiff to undergo a physical examination. Plaintiff immediately submitted his resignation. As plaintiff explained at trial, he could no longer contend with the defendants' "harassment."
All defendants moved for an involuntary dismissal at the close of plaintiff's case. In granting the Board's motion, the trial court found no officially sanctioned policy depriving plaintiff of his constitutional rights. The court emphasized that the Board acted within its powers in restructuring the bureaucracy and in creating the Department of Governmental Properties with Sarro as its Director. The evidence thus did not disclose any constitutional violation committed by the Board. As to the individual defendants, the trial court found "no causal" connection between their conduct and plaintiff's resignation. In reaching this conclusion, the court refused to consider any act that occurred before or after each freeholder's term of office. For example, Green's presentation of the list of employees to be discharged took place after his election but before he was sworn into office. The court concluded that, because Green was not a freeholder at that time, he could not be regarded as having "act[ed] under color of law with respect to that conversation." In a somewhat similar vein, the trial court declined to hold LaPolla and Fahey responsible for plaintiff's termination, because their terms had concluded by the time Morgan submitted his resignation. The court also found no "causal relation" between the conduct of Suliga and Sarro and plaintiff's decision to resign. As to Suliga, the court found no statement or act that "causally related to any [of the] injur[ies] or claim[s]" *354 alleged by the plaintiff. In exonerating Sarro from liability, the court stressed that his statements and acts "didn't cause [plaintiff] any harm" and thus were "not actionable."

II.

A.
We now consider the Law Division's pretrial decisions. We first examine plaintiff's arguments that the Law Division erred by granting defendants' motion for partial summary judgment. These contentions clearly lack merit and do not require extended discussion. R. 2:11-3(e)(1)(E).
We are entirely satisfied that the Law Division was correct in dismissing plaintiff's claim for intentional infliction of emotional distress. To establish such a claim, the plaintiff must prove intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. See Restatement (Second) of Torts § 46 (1965). The severity of the emotional distress "raises questions of both law and fact." Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 367, 544 A.2d 857 (1988). Thus, "the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Ibid. Where the intentional conduct is directed at the plaintiff, he or she need not prove any physical injury. Hume v. Bayer, 178 N.J. Super. 310, 319, 428 A.2d 966 (Law Div. 1981). However, allegations relating to aggravation, embarrassment, minor headaches, and loss of sleep are not enough to withstand a motion for summary judgment. Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. at 368, 544 A.2d 857. We are thus in complete accord with the Law Division's conclusion that plaintiff's claims of "severe humiliation, anxiety, and emotional distress" were not sufficient to establish a cause of action. Stated somewhat differently, we agree with the Law Division that the emotional distress alleged was not sufficiently severe to require a trial respecting the *355 issue. See Zamboni v. Stamler, 847 F.2d 73, 80 (3d Cir.), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988).
Equally devoid of merit is plaintiff's argument that the Law Division improperly dismissed his claim for federal and state due process violations. The Law Division granted partial summary judgment dismissing this claim on the basis that plaintiff had no property interest in his position as Director. We agree with this determination. The United States Supreme Court has held that a public employee who has no statutory or contractual entitlement to his job has no property interest subject to the protection of the Fourteenth Amendment. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); see also Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Thus, an employee hired at will has no protected interest in his employment and may not prevail on a claim that his or her discharge constituted a violation of property rights. See Board of Regents v. Roth, 408 U.S. at 578, 92 S.Ct. at 2709, 33 L.Ed.2d at 561. Here, plaintiff had no entitlement to his position and cannot assert a property interest in his continued employment.
We add that plaintiff enjoyed no "liberty interest" in his position. In Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 390 A.2d 90 (1978), our Supreme Court held that an at will public employee was entitled to a due process hearing because, under then existent civil service regulations, removal exposed him to potential future disqualification. Id. at 168, 390 A.2d 90. Here, plaintiff does not face disqualification from future public employment and has asserted no liberty interest subject to constitutional protection. See Battaglia v. Union County Welfare Bd., 88 N.J. 48, 56-57, 438 A.2d 530 (1981).
Finally, we perceive no sound reason to disturb the Law Division's dismissal of plaintiff's claim based upon the Optional County Charter Law. Among other things, that statutory scheme bars freeholders from "individually or collectively ... influenc[ing] the head of the executive branch to dismiss any person from ... *356 any position in the executive branch of county government," N.J.S.A. 40:41A-87a, and provides that "the board of chosen freeholders shall deal with county employees only through the officials responsible for the over-all executive management of the county's affairs ... i.e., through ... the county manager." N.J.S.A. 40:41A-86. We agree with the Law Division's conclusion that plaintiff had no private cause of action for a violation of these provisions. See In re State Comm'n of Investigation, 108 N.J. 35, 41, 527 A.2d 851 (1987). The plaintiff is not "one of the class for whose especial benefit th[is] statute was enacted." Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36 (1975) (quoting Texas & Pacific Ry. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874, 877 (1916)). We discern no legislative intent "to create a private cause of action." In re State Comm'n of Investigation, 108 N.J. at 41, 527 A.2d 851. Having said this, we do not foreclose the possibility of injunctive or declaratory relief being granted under the Optional County Charter Law in some circumstances. Here, however, the point is academic. Assuming there were violations of the statutory scheme, we have no roving commission to correct these mistakes in this case where plaintiff has not sought reinstatement and no future harm is imminent or threatened.

B.
We next consider defendants' arguments that the Law Division incorrectly denied their motions for summary judgment. We previously alluded to the contentions advanced in defendants' cross-appeal. To reiterate, defendants assert that plaintiff failed to comply with the notice provisions of the Tort Claims Act, that Morgan's discharge was constitutional because political affiliation was an appropriate job qualification, and that they were immune from suit. We review these arguments seriatim.
We need not tarry in dealing with defendants' contention regarding the notice provisions of the Tort Claims Act. The Act applies to actions against public entities, but not public *357 employees. Chatman v. Hall, 128 N.J. 394, 403, 608 A.2d 263 (1992). Any failure to adhere to the Act's provisions would only affect plaintiff's claims against the Board. Because the trial court granted the Board's motion for an involuntary dismissal, and we now affirm that determination, a failure to comply with the notice provision would have little or no impact on the status of this litigation.[3] In any event, we are convinced that plaintiff provided notice in a timely fashion. Plaintiff's original complaint alleged violations of his federal and state constitutional rights. The complaint also referred to violations of the Optional County Charter Law. The notice of claim provisions clearly did not apply to these causes of action. See Fuchilla v. Layman, 109 N.J. 319, 330-32, 537 A.2d 652, cert. denied sub nom. University of Medicine and Dentistry v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Plaintiff filed a notice of claim prior to amending his complaint to allege the torts of retaliatory discharge, infliction of emotional distress, and tortious interference with economic advantage. He thus substantially complied with the Act's notice provisions.
We come to the heart of plaintiff's case. As we noted at the outset of this opinion, plaintiff claims that his discharge was based upon his political affiliation and that defendants' actions deprived him of his First Amendment rights.[4] Defendants contend, however, that political affiliation constituted an appropriate job qualification and that plaintiff's termination was not violative of his constitutional rights. This argument was presented to the *358 Law Division in the form of a motion for summary judgment. The Law Division's opinion on the issue is not altogether clear. Specifically, we cannot discern whether the court held, as a matter of law, that political affiliation was not an appropriate job qualification, or whether it concluded that the issue should be resolved at trial. The case was tried before a different judge who adopted the latter view. Because the issue is fact sensitive and involves highly significant policy considerations, we hold that the Law Division was correct in denying defendants' motion for summary judgment. In our view, resolution of the question required full development of the evidence at a plenary trial. See Jackson v. Muhlenberg Hosp., 53 N.J. 138, 142, 249 A.2d 65 (1969).
In Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a newly elected Democratic sheriff discharged nontenured Republican employees and replaced them in accordance with past patronage practice. Id. at 350-51, 96 S.Ct. at 2678-79, 49 L.Ed.2d at 552. Justice Brennan, writing for a plurality of three members of the Court, held that terminations based upon political patronage infringed upon the employees' First Amendment rights of expression and association. Id. at 373, 96 S.Ct. at 2689, 49 L.Ed.2d at 565. Because First Amendment values were at stake, Justice Brennan wrote that discharges based upon political affiliation were permissible only when supported by a compelling state interest that could not be accomplished in a less drastic manner. Id. at 363, 96 S.Ct. at 2685, 49 L.Ed.2d at 559-60. In that respect, "[l]imiting patronage dismissals to policy making positions" was said to serve proper governmental purposes. Id. at 367, 96 S.Ct. at 2687, 49 L.Ed.2d at 562. Justice Brennan concluded that this test was not satisfied with respect to the employees concerned. Id. at 373, 96 S.Ct. at 2689, 49 L.Ed.2d at 565. Justice Stewart and Justice Blackmun concurred, expressing the view that a "nonpolicymaking, nonconfidential government employee [cannot] be discharged or threatened with discharge from a job that he is satisfactorily performing [on] the sole ground of his political beliefs." Id. at 375, 96 S.Ct. at 2690, 49 L.Ed.2d at 566.
*359 These tests were refined in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), where a newly appointed Public Defender attempted to discharge all incumbent assistants belonging to a rival political party. Id. at 509-510, 100 S.Ct. at 1290, 63 L.Ed.2d at 578. Writing for a six person majority, Justice Stevens recognized that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Id. at 517, 100 S.Ct. at 1294, 63 L.Ed.2d at 583. Resolution of the question was said to hinge upon "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518, 100 S.Ct. at 1295, 63 L.Ed.2d at 584. Whether the job is "confidential" or "policy-making" in character is not dispositive, but apparently is to be considered as bearing upon the issue. Ibid.
The propositions extrapolated from Elrod and Branti are difficult to apply and have yielded checkered results. In Battaglia v. Union County Welfare Bd., 88 N.J. at 48, 438 A.2d 530, our Supreme Court held that an attorney for a county welfare board, who was denied continued employment because of his political beliefs, was not deprived of his First Amendment rights. Emphasizing the confidential nature of the attorney-client relationship and the policy-making responsibilities imbued in the office, the Court determined that political affiliation was an appropriate job criterion. Id. at 63-67, 438 A.2d 530.
In other reported New Jersey opinions, our courts have held that a county jail warden could be fired for political reasons, Butler v. Amato, 220 N.J. Super. 409, 532 A.2d 291 (Law Div. 1987), rev'd on other grounds, 224 N.J. Super. 124, 539 A.2d 1241 (App. Div. 1988), and that a municipal supervisor of senior citizen activities could be discharged for political affiliation, Dyke v. Otlowski, 154 N.J. Super. 377, 383, 381 A.2d 413 (Ch.Div. 1977), but that a municipal housing inspector was protected from patronage termination. *360 Id. at 383-85, 381 A.2d 413. We have found no State opinions dealing with a supervisory position similar to that at issue here.
In a series of decisions, other jurisdictions have concluded that political affiliation constitutes an appropriate job qualification for supervisory positions relating to buildings and grounds. See, e.g., O'Connor v. Steeves, 994 F.2d 905, 909-10 (1st Cir.1993); Roman-Melendez v. Inclan, 826 F.2d 130 (1st Cir.1987); Tomczak v. City of Chicago, 765 F.2d 633 (7th Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); Diamond v. Chulay, 811 F. Supp. 1321, 1328 (N.D.Ill. 1993); but see Akers v. West Virginia Dep't of Highways, 188 W. Va. 698, 425 S.E.2d 840 (1992) (holding that position of county maintenance superintendent did not require its holder to share the same political affiliation or association as governor to effectively perform duties, and thus transfer of superintendent based on his party affiliation was an unconstitutional infringement on his First Amendment rights). However, the responsibilities of the public officers affected in these cases were quite expansive and included "significant decisionmaking authority in areas involving room for principled disagreement." Diamond v. Chulay, 811 F. Supp. at 1329.
Against this backdrop, we conclude that the Law Division was correct in denying defendants' motions for summary judgment. While it is true that the documentary submissions which accompanied defendants' motions were substantial, they did not fully respond to the broad based inquiry required in this fact sensitive case.
In deciding whether a public employee is protected from a politically motivated discharge, the courts have generally applied a two-pronged test. The first inquiry is "whether the overall functions of the employee's department or agency involve `decision making on issues where there is room for political disagreement on goals or their implementation.'" O'Connor v. Steeves, 994 F.2d at 910 (quoting Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir.1986) (en banc), cert. denied, 481 U.S. 1014, *361 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987)); see also Rodriguez-Burgos v. Electric Energy Auth., 853 F.2d 31, 35 (1st Cir.1988). The second inquiry is "whether the particular responsibilities of the plaintiff's position, within the department or agency, resemble those of a `policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement' for continued tenure." O'Connor v. Steeves, 994 F.2d at 910 (quoting Jimenez Fuentes v. Torres Gaztambide, 807 F.2d at 242). "Among the indicia material to the second element are `relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.'" Ibid. Despite the voluminous record placed before the Law Division, the issue presented clearly required broader evidential development and exploration. We thus affirm the Law Division's denial of summary judgment with respect to this issue.
Equally unpersuasive are defendants' claims that they possessed qualified immunity for the termination decision as a matter of law. Qualified immunity shields government officials from liability for civil damages when they perform discretionary functions, unless their acts violate clearly established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). A right is clearly established when its "contours ... [are] sufficiently clear that a reasonable official would understand that [the act in which he is engaging] violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). This liability attaches if the unlawfulness of the official's act is objectively apparent given the pre-existing law at the time of the conduct alleged to be a deprivation of another's civil rights. Ibid; see also Pounds v. Griepenstroh, 970 F.2d 338, 340 (7th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993). Under this *362 standard, it is not necessary for the plaintiff to establish that "the very act[] in question" has previously been held to be unlawful in order to avoid qualified immunity. Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531. The Third Circuit has similarly rejected this "requirement of strict factual identity in favor of a more balanced approach." Bennis v. Gable, 823 F.2d 723, 733 (3d Cir.1987); see also Good v. Dauphin County Social Servs., 891 F.2d 1087, 1092 (3d Cir.1989). However, plaintiff must demonstrate that he possessed a clearly established right to be free from an adverse employment action motivated by political considerations. See McDonald v. Haskins, 966 F.2d 292, 293 (7th Cir.1992); Landstrom v. Illinois Dep't of Children & Family Servs., 892 F.2d 670, 676 (7th Cir.1990). In other words, the appropriate inquiry is whether the law as to a political discharge of a person in plaintiff's position was apparent in relation to the specific facts confronting the defendants when they acted as they did. See Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir.) (en banc), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).
It has been said that "qualified immunity protects `all but the plainly incompetent or those who knowingly violate the law.'" Anderson v. Creighton, 483 U.S. at 638, 107 S.Ct. at 3038, 97 L.Ed.2d at 530 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986)). The record presented to the Law Division was not sufficient to establish whether or not defendants knew or reasonably should have known that plaintiff's position was protected from a patronage dismissal. The court correctly denied defendants' motions for summary judgment on this basis.

III.
We now turn to plaintiff's argument that the trial court erred by dismissing his claim for violations of his federal civil rights. Our examination of the record convinces us that the trial court acted correctly in granting the Board's motion for an involuntary dismissal. *363 However, we are satisfied that plaintiff presented a prima facie case against the individual defendants.
We begin with the language of 42 U.S.C.A. § 1983 (1981):

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State [,] ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... (emphasis added).
The underscored language "plainly imposes liability on a government that, under color of some official policy, `causes' an employee to violate another's constitutional rights." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978). However, the statutory scheme cannot be read "to impose liability vicariously on governing bodies solely on the basis of ... an employer-employee relationship with a tortfeasor." Ibid.; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107, 118 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452, 463 (1986). A governmental body "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. New York City Dep't of Soc. Servs., 436 U.S. at 694, 98 S.Ct. at 2037, 56 L.Ed.2d at 638. Instead, it is only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694, 98 S.Ct. at 2037-38, 56 L.Ed.2d at 638.
Applying this principle, the record discloses no "officially sanctioned or ordered" policy that deprived plaintiff of his civil rights. City of St. Louis v. Praprotnik, 485 U.S. at 123, 108 S.Ct. at 924, 99 L.Ed.2d at 118. Clearly, the Board had the authority to reorganize County agencies and to appoint department heads and their subordinates. No evidence was presented indicating that the Board, as distinguished from its individual members, took action against the plaintiff or deprived him of rights guaranteed by the *364 Constitution. We, thus, affirm the trial court's dismissal of plaintiff's claim against the Board.[5]
Plaintiff's case against the individual defendants stands on an entirely different footing. Accepting as true all the evidence supporting plaintiff's claim and according him the benefit of all reasonable inferences flowing from the proofs presented, we find that "reasonable minds could differ" regarding whether defendants entered into an unlawful conspiracy to deprive Morgan of his civil rights. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). Consideration of each defendant's conduct in isolation, which was the trial court's thesis here, perhaps disclosed no act in itself sufficient to establish a violation of the First Amendment. However, defendants' conduct cannot be dissected into discrete, watertight compartments. Instead, the sequence of events, viewed in its entirety, created a substantial enough possibility of a conspiracy to defeat the individual defendants' motions for an involuntary dismissal. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 156-57, 90 S.Ct. 1598, 1607-08, 26 L.Ed.2d 142, 153-54 (1970).
In reaching the opposite conclusion, the trial court ignored the law of conspiracy. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties `to inflict a wrong against or injury upon another,' and `an overt act that results in damage.'" Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir.1973) (quoting Neff v. World Publishing Co., 349 F.2d 235, 257 (8th Cir.1965)). The gist of the claim is not the unlawful agreement, "but the underlying wrong which, absent the conspiracy, would give a right of action." Board *365 of Education v. Hoek, 38 N.J. 213, 238, 183 A.2d 633 (1962); Middlesex Concrete Prods. and Excavating Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 516, 181 A.2d 774 (1962); Earl v. Winne, 14 N.J. 119, 135, 101 A.2d 535 (1953). The wrong done here allegedly consisted of defendants' conduct in depriving plaintiff of his constitutional rights. In order to prove the existence of such a conspiracy, plaintiff was not required to provide direct evidence of the agreement between the conspirators. Board of Education v. Hoek, 38 N.J. at 238-39, 183 A.2d 633. It is "well known that the nature of a conspiracy is such that more often than not the only type of evidence available" is circumstantial in nature. Id. at 239, 183 A.2d 633. Absent the testimony of a co-conspirator, it is unlikely that direct evidence of an unlawful agreement will exist. Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir.1979), rev'd on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). "Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can `infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives." Ibid. (quoting Adickes v. S.H. Kress & Co., 398 U.S. at 158, 90 S.Ct. at 1609, 26 L.Ed.2d at 155).
A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "`exact limits of the illegal plan or the identity of all participants.'" Ibid. (quoting Hoffman-LaRoche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir.1971)). The unlawful agreement need not be express. The participants in the conspiracy "must share the general conspiratorial objective, but ... need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result." Ibid. To establish a conspiracy, "it simply must be shown that there was `a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" Ibid. (quoting Hoffman-LaRoche, Inc. v. Greenberg, 447 F.2d at 875).
*366 Under the criminal law, "[t]he acts and declarations of a conspirator in furtherance of the conspiracy are binding on all parties to the conspiracy." State v. Porro, 152 N.J. Super. 179, 188, 377 A.2d 909 (App.Div. 1977), appeal dismissed, 77 N.J. 504, 391 A.2d 517 (1978). Stated another way, "once a ... conspiracy is formed, each conspirator while a member [of the unlawful combination] is liable for every act and declaration of each and all of the conspirators, done or made in the pursuance of ... the conspiracy." State v. Murphy, 168 N.J. Super. 214, 217, 402 A.2d 944 (App.Div.), certif. denied, 82 N.J. 264, 412 A.2d 771 (1979); see also United States v. Gonzales, 729 F. Supp. 1057, 1062 (D.N.J. 1990); United States v. Carter, 576 F.2d 1061, 1064 (3d Cir.1978); United States v. Benedetto, 558 F.2d 171, 175-76 (3d Cir.1977); cf. State v. Bridges, 133 N.J. 447, 466-67, 628 A.2d 270 (1993) (holding that a co-conspirator may be liable for the commission of substantive criminal acts that are not within the scope of the conspiracy if they are reasonably foreseeable as the necessary or natural consequences of the conspiracy). These principles are equally applicable to civil conspiracies. See Hampton v. Hanrahan, 600 F.2d at 621.
Within this analytical framework, the evidence, if believed by the jury, was sufficient to establish each individual defendant's participation in a conspiracy to deprive plaintiff of his civil rights. The trial court found no causal connection between each defendant's acts and statements and the plaintiff's constructive discharge. However, no consideration was given to the principle that each conspirator was bound by the acts and declarations of his colleagues.[6] As we pointed out, it was not necessary that each of *367 the conspirator's acts, standing alone, was such as to compel plaintiff to resign. Instead, the question was whether the combination of defendants' acts made plaintiff's working conditions "so intolerable that he was forced into an involuntary resignation." Bailey v. Kirk, 777 F.2d 567, 580 (10th Cir.1985); see also Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir.1984); Muench v. Township of Haddon, 255 N.J. Super. 288, 301, 605 A.2d 242 (App.Div. 1992); Alicea v. New Brunswick Theological Seminary, 244 N.J. Super. 119, 136 n. 1, 581 A.2d 900 (App.Div. 1990), aff'd 128 N.J. 303, 608 A.2d 218 (1992); Kass v. Brown Boveri Corp., 199 N.J. Super. 42, 46-50, 488 A.2d 242 (App.Div. 1985). We are satisfied that there was sufficient evidence from which the jury could infer the existence of a conspiracy to terminate plaintiff's employment because of his political affiliation. Plaintiff's claim for violations of § 1983 should have been presented to the jury for its consideration.
We also conclude that the trial court erred by dismissing plaintiff's claim for punitive damages. In Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the United States Supreme Court held that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 56, 103 S.Ct. at 1640, 75 L.Ed.2d at 651; see also Savarese v. Agriss, 883 F.2d 1194, 1203-05 (3d Cir.1989); Perez v. Cucci, 725 F. Supp. 209, 257 (D.N.J. 1989), aff'd, 898 F.2d 142 (3d Cir.1990). This standard is essentially the same as that ordinarily applied in New Jersey respecting punitive damages.[7]See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 *368 N.J. 37, 49, 477 A.2d 1224 (1984); Potter v. Village Bank, 225 N.J. Super. 547, 563, 543 A.2d 80 (App.Div.), certif. denied, 113 N.J. 352, 550 A.2d 462 (1988). We conclude that there was sufficient evidence of an evil motive to require submission of the question of punitive damages to the jury.

IV.
Because this case must be retried, we briefly comment on several of the evidentiary questions that may recur. Initially, we find that the trial court erred when it permitted cross-examination of the plaintiff concerning an incident which occurred in 1973 when he was a Roselle Park councilman. Apparently, plaintiff objected to the appointment of a Democrat to the position of police department clerk. Although plaintiff claimed that she was not qualified, defendants presented a newspaper article in which he was quoted as saying that the job was not intended to "go to the vice-president of the democratic organization." The trial court apparently found this evidence relevant to the question of plaintiff's credibility. This evidence was far too remote to bear on plaintiff's credibility and should have been excluded. Defendants should not refer to the incident at the retrial.
On cross-examination, defendants elicited testimony that plaintiff had lied in completing a job application for Public Service Electric & Gas. Plaintiff apparently stated that he had completed at least two years of college, when in fact he had not. This incident occurred some forty years ago. Plaintiff repeated this misrepresentation in 1959 when he applied for a promotion, but Public Service apparently learned the true state of facts and forced Morgan to apologize. The trial court found this evidence relevant to the question of credibility. We disagree. The evidence *369 was remote in time, and, in any event, had little or no tendency to prove a material fact in issue. It should have been excluded.
Defendants were permitted to show that plaintiff's hiring by the County was improper because the time for which his position was posted was too short and did not satisfy applicable regulations. To support introduction of this evidence, defendants asserted to the trial court that "he who lives by the patronage sword must die by the patronage sword[,]" and that "if a person receives a job by violating the First Amendment, he cannot use that First Amendment as a protection [for] the job." Apparently, the trial court was persuaded by this contention and admitted evidence relating to the circumstances surrounding plaintiff's appointment. We are convinced that the evidence was improperly admitted for this purpose. The fact that a hiring was based on party affiliation is not a defense to a political patronage termination. See Branti v. Finkel, 445 U.S. at 509, 100 S.Ct. at 1290, 63 L.Ed.2d at 578; Elrod v. Burns, 427 U.S. at 351, 96 S.Ct. at 2678-79, 49 L.Ed.2d at 552; Perez v. Cucci, 725 F. Supp. at 215. A multitude of wrongs "do not make a right" or permit a jury to "find palatable" a defendant's unconstitutional conduct. Perez v. Cucci, 725 F. Supp. at 240; see also Zold v. Township of Mantua, 935 F.2d 633, 639 (3d Cir.1991). Any prior misuse of a venerated political practice  "the spoils system" does not justify its current use. Perez v. Cucci, 725 F. Supp. at 240. The evidence should have been excluded.[8]
Finally, plaintiff argues that the trial court erroneously excluded a grand jury presentment which criticized freeholders for pressuring the County Manager to terminate employees because of political affiliation. Plaintiff asserts the presentment was returned prior to some of the acts which he claims violated his civil rights. The trial court barred admission of the document under *370 Evid.R. 4. The court also observed that portions of the presentment recounted hearsay which was not independently admissible under any recognized exception. In our view, the presentment was highly relevant respecting the defense of qualified immunity. We recognize that parts of the document may fall afoul of our hearsay rule and other portions may be too conclusory to permit their admission. However, steps may be taken to delete offending parts of the presentment while permitting admission of other portions. The question should be reconsidered at the retrial.
The judgment is affirmed in part and reversed in part. That part of the judgment that dismisses plaintiff's claims against the Board is affirmed. That part of the judgment that dismisses plaintiff's claims for violations of § 1983 and for tortious interference with prospective economic advantage against the individual defendants is reversed and the matter is remanded for retrial.
NOTES
[1] Union County is the only county in New Jersey with the county manager form of government.
[2] Apparently, the list referred to a lateral transfer of one Republican.
[3] Technically, dismissal of plaintiff's civil rights action leaves intact his claim for retaliatory discharge as being against public policy. At argument, however, plaintiff agreed that the retaliatory discharge claim was subsumed in his § 1983 action, because they are based upon the denial of his First Amendment rights.
[4] First Amendment rights are incorporated into the Fourteenth Amendment and therefore limit state action. See Edelman v. Jordan, 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1358 n. 12, 39 L.Ed.2d 662, 675 n. 12 (1974). Though the Fourteenth Amendment bears directly on the States, the specific rights granted by the First Amendment govern here.
[5] These same principles bar application of conspiratorial liability under § 1983 to a government agency unless it acted pursuant to an officially sanctioned policy. In other words, a government agency cannot be found liable under § 1983 unless its wrongful conduct represents an officially sanctioned policy as defined above.
[6] We add that the trial court erred by refusing to consider Green's conduct after he was elected but before he assumed office by taking the oath. In this interim period, Green was not acting as a private person, but rather as a public official under "color of law." In a similar vein, the fact that Fahey and LaPolla had concluded their terms by the time plaintiff submitted his resignation is wholly irrelevant. Plaintiff sought to hold them liable for the acts they committed while in office. They would be no less responsible for their actions because their ultimate goal, plaintiff's removal, occurred several months after their terms ended.
[7] The trial court dismissed plaintiff's claims against the individual defendants for tortious interference with his prospective economic advantage, finding that the county "[could not] interfere with its own employment relation." However, it is possible for employees to tortiously interfere with the employment relationship between a co-employee and the employer. See Muench v. Township of Haddon, 255 N.J. Super. at 302-03, 605 A.2d 242. It is unclear whether plaintiff seeks punitive damages respecting this cause of action. This issue, punitive damages, has not been raised and we need not address it further.
[8] Defendants have not argued that this evidence was admissible respecting the question of qualified immunity. We express no view on this issue.