284 N.J. Super. 639 (1995)
666 A.2d 191
CAROLYN MCKINNEY, INDIVIDUALLY, GABRIEL MCKINNEY, AN INFANT BY HIS GUARDIAN AD LITEM, CAROLYN MCKINNEY, DAVID MCKINNEY, JR., BY HIS GUARDIAN AD LITEM, CAROLYN MCKINNEY, AND DAVID MCKINNEY, SR., PLAINTIFFS-APPELLANTS,
v.
EAST ORANGE MUNICIPAL CORPORATION, ANTHONY WOODSON, JOHN DOE (FICTITIOUS NAME) AND RICHARD ROE (FICTITIOUS NAME), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1995.
Decided October 31, 1995.
*642 Before Judges PRESSLER, KEEFE and WEFING.
Emanuel Needle argued the cause for appellants (Kohn & Needle, attorneys; Rochelle L. Gluck, on the brief).
Lissa Jean argued the cause for respondent East Orange Municipal Corporation (Brown, Lofton, Childress & Wolfe, attorneys; James H. Wolfe, III on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
On December 31, 1986, plaintiffs Carolyn and David McKinney, Sr. with their two sons, Gabriel, then seventeen, and David, Jr., then fourteen, were living in the first-floor apartment of a three-story, three-family house in East Orange. At 10 o'clock that morning, David McKinney, Sr. was out seeing to the repair of his car. Carolyn McKinney, on holiday from her job, was in her bedroom, dressed in her nightgown, talking to a friend on the telephone. Gabriel was preparing to leave for basketball practice. David, Jr. was still asleep. Suddenly and without warning, the front door of the apartment was battered down by a sledgehammer, and a team of ten East Orange police officers, most in plain clothes but some in uniform, entered with weapons drawn. According to plaintiffs, the mother and her sons were then manhandled, threatened, abused and terrorized by the officers, who searched the apartment for drugs and found none. The leader of the team, Detective Woodson, on whose affidavit the search warrant had been issued, then realized that not only was there no *643 contraband in the apartment, but that the "wrong" apartment had been broken into and searched.
Plaintiffs commenced this action against East Orange and Detective Woodson seeking a remedy under 42 U.S.C.A. § 1983. They appeal from a partial summary judgment dismissing, on qualified immunity grounds, those of their claims that were based on the issuance of the warrant and its no-knock execution up to the point at which the officers entered their home. The partial summary judgment reserved for trial those issues arising out of the officers' conduct after effecting their entry. A jury returned a verdict of no cause from which plaintiffs also appeal, contending that the trial judge improperly precluded the testimony of their expert on police procedure despite the plethora of testimony admitted on defendants' behalf attesting to the officers' compliance with routine police procedure.
We reverse and remand on all issues. Our review of the record satisfies us that there was, at the least, a genuine question of fact respecting the qualified immunity defense and that the trial judge erred in excluding the proffered expert testimony.
We consider first the qualified immunity defense, beginning with the facts surrounding the issuance of the warrant. As we have noted, the warrant was issued on Woodson's affidavit dated December 29, 1986. The relevant assertions in the affidavit start with Woodson's statement that he received information from a reliable informant on December 18, 1986, "that a black female known as Ameetrah was selling narcotics from the 1st floor apartment of 167 N. 18th Street, East Orange...." Woodson then set out to corroborate this information. It is clear from the affidavit as well as from his trial testimony that the totality of his investigation following the receipt of the original information was to arrange two buys by other police informants. Thus the affidavit goes on to explain that on December 19, 1986, Woodson gave a second informant $10 to purchase marijuana and accompanied the informant, after strip-searching him, to the 18th Street address, keeping him constantly under surveillance except for the seven *644 minutes during which the informant was actually in the building. When the informant left the building, he met Woodson at a prearranged meeting place, having been under Woodson's observation from the time he left the building. When they met,
the informant handed this detective a small plastic bag containing a green vegetative substance. The informant stated the substance was purchased from the 1st floor of 167 N. 18th St, from a black female known as Ameetrah described as being 5'7" feet tall, approximately 115 lbs, short black hair, between 21 and 24 years of age and having a medium complexion. .. .
Woodson then arranged for a second ten-dollar buy of marijuana by yet another informant on December 23, 1986. The procedures employed in making the first buy were followed again. Woodson's affidavit reports that when the second informant-buyer turned over his plastic bag of green vegetative matter that later proved to be marijuana, he, too,
stated the substance was purchased from the 1st floor of 167 N. 18th St, from a black female known as Ameetrah described as being 5'7" feet tall, approximately 115 lbs, short black hair, between 22 and 24 years old and having a medium complexion....
Woodson's affidavit concludes as follows:
Based on the aforementioned facts as set forth in this investigation I have just and reasonable cause to believe and do believe that a black female person known as Ameetrah in the first floor apartment at 167 N. 18th St. is engaged in the distribution of narcotics from the first floor apartment at 167 N. 18th St.... . I therefore respectfully request the court to authorize a search warrant for the first floor apartment at 167 N. 18th St., East Orange, N.J. as to locate any narcotics, narcotics paraphernalia, ledgers, phone books or letters and seize the same.
Finally, the affidavit describes the subject premises as follows:
The suspect location is on the west side of N. 18th Street, between Park Avenue on the south side and 4th Avenue on the north side, the building is a three-story, green and white in color, with the numerals 167 affixed to the left side of the front outer doorframe. The suspect apartment is located on the first floor, to your immediate right as you enter the outer door.

[Emphasis added.]
The warrant was issued by a municipal judge on December 29, 1986. It described the subject premises exactly as they were described in the affidavit. It was executed two days later.
It is clear from both the summary judgment motion and from the police testimony at trial that as of the time Woodson had *645 executed his affidavit and presented it to the municipal judge, he himself had never been inside the building, although the foyer, vestibules and staircases were readily accessible to the public. Nor had Woodson ever made any effort to determine the identity of the occupants of any of the apartments in the house, or to determine if there was a woman answering to the name or fitting the description of Ameetrah who might have either lived in or frequented one of the apartments. There was no surveillance of the building in an effort to identify Ameetrah. There was, in fact, not a single additional fact known to Woodson other than those appearing in his affidavit. There is no explanation of where or from whom the description of the apartment as being immediately "on your right as you enter" came from. Nor is there any suggestion of any further interrogation of the two buyer-informants as to precisely where they met Ameetrah, how they found Ameetrah in the building, whether the purchase was made in a vestibule or other common area of the building or in one of the apartments, whether they were able to observe or speculate about Ameetrah's stash, or whether any other persons were present when the buy was made. Thus, while the affidavit tells us precisely what Woodson did do, the litany of what he did not do would probably fill a police-procedure manual.
In any event, Woodson and his team of nine other officers arrived at 167 N. 18th Street at 10 a.m. Several officers went immediately to the rear of the house, stationing themselves at the back door. The others entered the building by the common outer door. Once in the common hallway, they immediately saw that there was no apartment at all "on the right as you enter." There was, however, an apartment down the hall on the left, namely, the McKinneys' apartment. Woodson elected to enter that one, and without any knock and announce, began to wield his sledgehammer. The first notice the occupants had of any of these events was hearing the sound of the sledgehammer battering down their door.
*646 Mrs. McKinney, terrified and believing that she and her children were in extreme peril from intruders, told her elder son to wake her younger son and run from the apartment. She and Gabriel ran out the back door. David, Jr., still in his pajamas, started towards the front door when it crashed in at his feet and he saw men with weapons drawn. He asserted, but the officers denied, that one of the officers delivered a karate kick to his chest, causing him to fall backwards onto the floor, from which he was lifted and carried into the kitchen, where he was dropped on the floor. Once in the kitchen, he says, he was instructed to lie facedown, warned not to move, and handcuffed with his hands behind his back. The officers do not deny that the boy was indeed handcuffed and placed on the floor. By this time, Mrs. McKinney and Gabriel had been seized at the back door and brought to the kitchen, Gabriel testifying that he was immediately placed in a headlock and taken in that manner into the kitchen, where he, too, was then handcuffed and placed on the floor with his brother.
Mrs. McKinney, who had been seized by the arm, was placed on a kitchen chair. She claimed that when she asked to be permitted to cover herself, because "you could see straight through" the sheer nightgown she was wearing, the officers responded with profanity. The three McKinneys also testified that their small dog, a terrier, was barking during the raid, and that the officers told them that if they couldn't keep it quiet they would shoot it. Mrs. McKinney also recalled that she was hysterical during most of the proceedings, crying, screaming, moaning, and utterly at a loss to understand what was happening. Her landlord, who entered the apartment after the door was broken down, corroborated that testimony.
While the McKinneys were held in the kitchen, the other officers searched the apartment, emptying all the drawers in all the rooms on the floor, overturning mattresses, examining the contents of Mrs. McKinney's purse, and generally dumping the McKinneys' personal effects helter-skelter. Mrs. McKinney also saw the officers using the telephone, sitting on the couch, and *647 eating candy from a dish in the living room. The officers concede that they left the premises without any intention or effort to repair their ravages. The main disparity between the McKinney version and the police version is the police insistence that Mrs. McKinney and her family were treated with respect and courtesy throughout the episode and that no excessive force was used on the two boys.
It is not disputed that the execution of the warrant at the McKinney apartment was a mistake, that none of the four McKinney had ever been even remotely involved in any criminal activity, that they had never had anything to do with anyone named Ameetrah, and that there was not, at least from the perspective of hindsight, the slightest reason to believe that their home had ever been the site of drug dealing or any other criminal activity. The central question raised by this case is whether Woodson is entitled, as a matter of summary judgment, to be relieved of the consequences of this mistake based on principles of qualified immunity. We think not.
We note, preliminarily, that in order to establish a viable § 1983 claim, a plaintiff must prove that the defendant, acting under color of law, violated a right guaranteed to plaintiff by federal law, constitutional or statutory. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572, 577 (1980). The defendant here was obviously acting under color of state law in having obtained and executed the warrant. Plaintiffs' fundamental privacy rights were clearly violated as was their Fourth Amendment right to be protected, in the absence of probable cause, from a police entry into and search of their home. See State v. Novembrino, 105 N.J. 95, 106, 519 A.2d 820 (1987). In these circumstances, the controlling legal principles are well settled. Nevertheless, a police officer will be immune from civil liability under § 1983 for a wrongful search if there were sufficient objective indicia of probable cause to justify the action taken even if, in fact, probable cause did not exist. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Malley v. *648 Briggs, 475 U.S. 335, 344-345, 106 S.Ct. 1092, 1097-1098, 89 L.Ed.2d 271, 280-281 (1986); Kirk v. City of Newark, 109 N.J. 173, 184, 536 A.2d 229 (1988). It is also well settled that the issue of objective reasonableness should typically be decided on a motion for summary judgment governed by federal substantive law, and that the "objectively reasonable" standard is, for this purpose, the same standard as is generally applicable to suppression motions in criminal actions. Howlett v. Rose, 496 U.S. 356, 375-378, 110 S.Ct. 2430, 2442-2444, 110 L.Ed.2d 332, 353-354 (1990); Malley, supra; Kirk, supra. Thus, the issue before the motion judge was whether, as a matter not subject to factual dispute, the conduct of defendant Woodson was objectively reasonable in two respects. First, were there sufficient objective indicia of probable cause to justify his application for the search warrant? Second, under all the circumstances, was his decision to execute the warrant by a "no-knock" breaking down of the door of plaintiffs' apartment objectively reasonable in light of both the warrant's evident misdescription of the premises to be searched and the totality of Woodson's knowledge? We are persuaded that the officer's conduct was not objectively reasonable as a matter of law in either respect. We are also persuaded that if the officer's conduct from the time he executed the affidavit in support of the warrant application to the time he broke down the plaintiffs' door is viewed as a single continuum, the totality of the conduct also fails the test of objective reasonableness beyond factual dispute.
We consider first the adequacy of the affidavit to support the requisite probable cause. In pursuing this inquiry, we point out first that the finding of probable cause necessarily made by the judicial officer issuing the warrant on the basis of the affidavit is not determinative of the issue  the executing officer is not entitled to rely on that finding to support a per se finding of objective reasonableness. Malley, supra, 475 U.S. at 345, 106 S.Ct. at 1098, 89 L.Ed.2d at 281. We are further aware that the standard of objective reasonableness is liberally construed in the officer's favor. Thus, as formulated by Malley, the officer's *649 conduct will have met the test unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable...." Malley, supra, 475 U.S. at 344-345, 106 S.Ct. at 1098, 89 L.Ed.2d at 281. Broad as that test is, we are persuaded that it was not, as a matter of law, here met.
In State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987), the New Jersey Supreme Court restated the standards prescribed by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, reh. denied, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983), for determining the adequacy of a search warrant application to support probable cause when the application relies on informant hearsay. We rely on Novembrino's analysis of federal constitutional law. The Novembrino analysis is predicated on the conclusion of Gates that
[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place....
[Id. 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.]
Accordingly, Novembrino explains that "search warrant applications that rely in part on an informant's tip will continue to require thorough scrutiny of the informant's veracity and basis of knowledge in the context of the totality of the facts contained in the officer's showing of probable cause." Novembrino, supra, 105 N.J. at 123, 519 A.2d 820. That scrutiny must be undertaken in order to determine if the application provides "a neutral judicial officer with a reasonable basis for suspicion that" a search of the designated premises "would yield evidence of criminal activity." Id. at 124, 519 A.2d 820. In the context of § 1983 liability, the inquiry is somewhat broader, encompassing not only the actual existence of probable cause but also, even where probable cause does not exist, the reasonableness of the officer's mistaken belief, based on what he knows, that probable cause does exist. Kirk v. City of Newark, 109 N.J. 173, 186, 536 A.2d 229 (1988).
*650 We are persuaded that the facts recited in the affidavit here did not provide a reasonable basis for suspicion. Although the affidavit vouched for the informant's veracity in the usual manner, that is, that the informant had given information in the past resulting in arrest and conviction, there was not the slightest indication of the basis of the initial informant's knowledge. Novembrino found a "critical deficiency" in an affidavit that furnished "no information whatsoever as to when the informant allegedly `witnessed' the drug sales." Novembrino, supra, 105 N.J. at 124, 519 A.2d 820. Here, there was not only no information as to time, but there was not even an allegation by the informant that he (or she) had in fact witnessed or participated in any drug sales. The informant's information could just as well have been a repetition of hearsay on his part. Moreover, while the informant's information included the intelligence that the narcotics sales were being made by Ameetrah (if indeed there ever was such a person) from the first-floor apartment at the designated address, there was no further description of the apartment nor any suggestion that he, the informant, had ever been in it.
It is obvious that this informant's information by itself would have been insufficient to provide probable cause justifying the issuance of a warrant to search any apartment at the designated address or to provide an officer with an objectively reasonable belief that probable cause existed. Just as obviously, however, the information was sufficient to warrant further investigation. We have already suggested what such an investigation could have consisted of. The question then is whether the totality of the facts produced by the "corroborating" investigation cured the patent deficiencies in the informant's reported information. We do not see how it could have done so.
The sum total of that investigation was the entry into the house by two different informant-buyers, the first on the day after the original receipt of the information and the second five days later. Each is reported by the affiant as having purchased ten dollars worth of marijuana from "Ameetrah" on the first floor of the *651 house. The actual location of the sale is described only as the first floor  there is no specification as to whether Ameetrah was in an apartment or a common area on the first floor. No other details of the asserted transaction are noted. Hence there was no corroboration of a sale made in any first-floor apartment  either to the left or to the right.
We think it plain that the totality of the circumstances asserted in the affidavit, coupled with the officer's failure to add any additional details of which he came to have knowledge, simply does not add up to an objectively reasonable suspicion of a likelihood that marijuana was being sold on a regular basis from an apartment "located on the first floor, to your immediate right as you enter the outer door."
Even more egregious, in our view, was the no-knock execution of the warrant at a location other than that specifically described. To begin with, the same officer who was the applicant for the warrant was the leader of the execution team. He is certainly chargeable with knowledge of the sparseness of the underlying information on which the warrant was issued and, according to this record, he had no additional knowledge which might have justified a belief that it was the apartment on the left, not an apartment on the right, that was the suspect premises all along. In sum, when the officers entered the building, they had to have become immediately aware that the description in the warrant was facially defective because there were no premises matching it.
Ambiguity in the designation in the warrant of the premises to be searched is, regretfully, not an uncommon phenomenon, and a body of law has emerged addressing the question of whether and under what circumstances proceeding with the execution of the warrant despite the facial defect may be considered to be reasonable police conduct, both immunizing the officer from § 1983 liability and saving any seized evidence from suppression. The unifying principle appears to be that the officer acts reasonably in executing the warrant either if he has information not appearing in the affidavit or warrant that enables him to resolve an apparent *652 ambiguity as to the intended premises or if the circumstances themselves support a more-likely-than-not logical deduction as to which of various alternative premises matching the description contained in the warrant were intended. See, e.g., State v. Wright, 61 N.J. 146, 293 A.2d 380 (1972), in which the premises to be searched were designated only as "top floor" of a specific building but were also identified in the warrant as the place where the named suspect lived. When the warrant was executed, it turned out that there were three apartments on the top floor. The suspect's was unnumbered. The executing officer, however, had knowledge of which of the three apartments was the suspect's. In validating the search of that apartment the Court noted that
While a search warrant must describe the premises to be searched with reasonable accuracy, pin-point precision is not demanded. (Citations omitted.) Here there was in fact no inaccuracy in the description; it simply failed to indicate by number which of three apartments was intended. In fact defendant's apartment had no number on the door. But the affidavit did state that the intended apartment was the one that was in fact occupied by the defendant. .. . The executing officer may take into account his prior knowledge as to the place intended in the warrant.... The underlying reason for the requirement that there be an adequate description of the premises in a search warrant is to prevent the police officer from entering property which he has no authority to invade. Obviously his own knowledge is a very relevant factor.
[Id. at 149, 293 A.2d 380.]
See also State v. Blackburn, 266 Or. 28, 511 P.2d 381 (1973), concluding that where the warrant designated the premises as apartment number 2 bearing the letters ECURB, it was reasonable for the police, as a matter of logical deduction in relying on the more specific designation, to search the apartment bearing those letters where they found two possibly intended apartments, one bearing the numeral 2 and no letters and one bearing the letters but no numeral. Compare, however, Commonwealth v. Treadwell, 402 Mass. 355, 522 N.E.2d 943 (1988), invalidating the search where the warrant description included two identifying factors, there were two apartments each of which bore only one factor, and the executing officer had no basis in personal knowledge or logical deduction based on the circumstances for electing to search either one as the more likely-intended premises.
*653 Even if the facial defect in the warrant here may be fairly regarded as an ambiguity rather than as a vitiating inaccuracy as identified by Wright, we are nevertheless satisfied that in the totality of the circumstances, the officer's decision to search the apartment on the left even though there was no apartment on the right was not objectively reasonable. Most significantly, he had no elucidating personal information. He did not know that the suspect, Ameetrah, lived in that apartment or did business from that apartment or had any connection with that apartment. He did not know of his own knowledge that there ever was an Ameetrah. He had no knowledge of who lived in the apartment on the left. He could not, therefore, have known if any of its residents had anything to do with Ameetrah. Further, he did not even know whether or not the two informant-buyers made their buys in an apartment. The point of course is that the officer knew very little and nothing based on his own knowledge or observation. The risk of an error was extremely high. The consequences of that risk were concomitantly high and significantly magnified by the police decision nevertheless to effect the no-knock execution customary in narcotics raids. Moreover, the lapse of time in conducting the total investigation suggests that not much exigency was involved. In our view, one cannot conclude with any assurance that under these circumstances the officer's decision to ignore the facial defect in the warrant was reasonable. We are, therefore, constrained to reverse the partial summary judgment according defendant Woodson immunity from liability with respect both to the obtaining of the warrant and its initial execution.
We also agree with plaintiffs' final contention  namely, that the trial judge erred in not permitting plaintiffs' expert on police procedure to testify. As we have noted, the action went to trial on the sole issue of whether the officers, after effecting their no-knock entry of plaintiffs' apartment, violated their civil rights by the manner in which they searched the premises and "secured" the occupants. See generally Gurski v. State Police Dept., 242 N.J. Super. 148, 576 A.2d 292 (1990). The leitmotif of the officers' *654 testimony was that everything they did following their entry, including the handcuffing of a fourteen-year-old boy in pajamas and placing him facedown on the kitchen floor, was all in accordance with police regulation and customary practice. It might have been. But we would venture to say that most citizens have never been the subject of a no-knock entry and have no personal knowledge of how the police should ordinarily thereafter conduct themselves vis-a-vis the occupants and the premises or of the variables that may properly govern police decision-making in this regard. Thus, plaintiffs' expert-witness proffer should have been accepted because it dealt with matters outside the average juror's ordinary experience and as to which expert testimony would have been helpful. See State v. Berry, 140 N.J. 280, 658 A.2d 702 (1995). Moreover, as a matter of fundamental fairness and procedural due process, admission of the expert testimony was virtually compelled in order to enable plaintiffs to meet the "regularity" testimony of the officers. It was harmful error to exclude it.
The partial summary judgments affording defendant Woodson immunity are reversed. The judgment of no cause entered on the jury's verdict is reversed. We remand for further proceedings consistent with this opinion.