699 A.2d 697

PETER CASAMASINO, PLAINTIFF–RESPONDENT/CROSS–AP-
PELLANT, AND DIRECTOR, DIVISION OF TAXATION AND
HUDSON COUNTY BOARD OF TAXATION, PLAINTIFFS/IN-
TERVENORS, v. CITY OF JERSEY CITY AND BRET SCHUN-
DLER, MAYOR OF THE CITY OF JERSEY CITY, DEFEN-
DANTS–APPELLANTS/CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 17, 1997—Decided September 2, 1997.

Before Judges BROCHIN, KESTIN and EICHEN.

*Carol Zylbert* argued the cause for appellant/cross-respondent City of Jersey City (*Sean M. Connelly*, attorney; *Ms. Zylbert* on the brief).

*Brian W. McAlindin* argued the cause for appellant/cross-respondent Bret Schundler (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *Mr. McAlindin*, of counsel and on the brief; *Kenneth R. Foreman* on the brief).

*Harry Haushalter* argued the cause for respondent/cross-appellant (*Conley and Haushalter*, attorneys; *Mr. Haushalter* on the brief).

*John R. Lloyd* argued the cause for amicus curiae Association of Municipal Assessors of New Jersey (*Rosenblum, Wolf & Lloyd*, attorneys; *Mr. Lloyd* on the brief).

No brief was filed on behalf of the plaintiffs/intervenors.

The opinion of the court was delivered by

EICHEN, J.A.D.

Plaintiff Peter Casamasino served as the tax assessor for defendant City of Jersey City (Jersey City) since his appointment in 1987 by then Mayor Anthony Cucci. Mayor Cucci appointed Casamasino to complete the term of the former tax assessor who had died in office two months before his term was set to expire on June 30, 1987. By Mayor Cucci's letter to the city council dated April 27, 1987, plaintiff was appointed to fill the term set to expire plus a full four-year term beginning on July 1, 1987. Copies of the letter were sent to the Jersey City clerk and law department.

However, the city council did not vote its advice and consent to the appointment as provided by the Faulkner Act, *N.J.S.A.* 40:69A–43(b).

When the four-year term to which plaintiff had been appointed expired on June 30, 1991, he continued to serve as tax assessor and was paid for performing the duties of that office even though he had not been formally reappointed. During this period, plaintiff was never advised that "there was any defect or impropriety in [his] appointment." On June 30, 1993, the then mayor, defendant Bret Schundler, advised plaintiff by letter that he was not being reappointed. Plaintiff was immediately relieved of his duties and directed to vacate his office.

On July 1, 1993, plaintiff filed a complaint in lieu of prerogative writs in the Law Division and obtained an order to show cause against Jersey City and Schundler, directing them to show cause why Casamasino should not be immediately reinstated to his position as tax assessor in accordance with his tenure rights under *N.J.S.A.* 54:1–35.31. According to Casamasino, his dismissal was retaliatory, illegal and motivated by the mayor's "personal animosity." The complaint and subsequent amendments thereto also charged defendants with violations of plaintiff's federal civil rights under 42 *U.S.C.* 1983 (§ 1983), the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, and sought relief under theories of "intentional infliction of physical and emotional harm, wrongful discharge from employment, libel and slander, and intentional interference with a business relationship." Plaintiff also demanded judgment directing defendants to "recognize and establish the tax assessor as a separate municipal department," and to pay his counsel fees in accordance with a resolution adopted on April 14, 1993. Finally, plaintiff sought compensatory and punitive damages, together with counsel fees and costs.

In a supporting certification, plaintiff explained that on June 30, 1993, at approximately 11:00 a.m., Schundler's chief of staff deliv-

ered a letter from Schundler which stated: "Please be advised that I am exercising my mayoral prerogative not to reappoint you as assessor. Effective herewith, you are relieved of your duties." "Without any warning or preparation," plaintiff was required to immediately pack his belongings, surrender his keys, and vacate his office, an experience plaintiff described as extremely humiliating.

According to plaintiff's complaint, Schundler's animosity toward him had its genesis in a history of incidents dating back to the late 1980's, before Schundler was mayor, at a time when Schundler was leader of an organization opposed to the 1988 tax revaluations of real property in Jersey City. In particular, plaintiff described an incident on January 25, 1993 at a council meeting when the mayor sought a resolution approving a plan to obtain revaluations and reassessments of real property in Jersey City. At the meeting, plaintiff voiced opposition to the mayor's proposal because he believed the proposed methods were in contravention of the guidelines promulgated by the State Division of Taxation.[1] After the council meeting, plaintiff alleged that the mayor threatened that he would "embarrass [Casamasino] every chance I get."

Plaintiff identified another incident in 1993 in which Jersey City's director of finance, Jane Feigenbaum, issued a two-day suspension to plaintiff forcing him to seek reinstatement by judicial decree. On March 30, 1993, a Chancery Division judge entered an order vacating the two-day suspension. Thereafter, on April 14, 1993, the city council adopted a resolution authorizing the city to reimburse Casamasino $8,079.14 for legal expenses he had incurred in defending against the unlawful suspension. These sums were never recovered apparently because Feigenbaum never encumbered the funds to pay Casamasino and a new city council thereafter voted to rescind the prior resolution. Casamasino alleged that he was never paid because defendant purposefully

---

[1] According to Casamasino, the director of Taxation confirmed that the mayor's plan was not in conformity with required guidelines.

disregarded his right to reimbursement. Additionally, plaintiff alleged that despite the Chancery Division judge's directive in 1993 to establish a separate department for the tax assessor from the department of finance, defendant refused to implement the order.

On July 30, 1993, the return date of the order to show cause, Judge D'Italia rendered an oral opinion and, after concluding that there were no disputed issues of material fact, determined that the council's failure to ratify plaintiff's initial appointment was not "a fatal defect" and that his removal was void. He reasoned that because "plaintiff occupied his office in an open and notorious manner," and the council was aware that plaintiff was "functioning in every respect as the [t]ax [a]ssessor," the council impliedly ratified the appointment by its silence and failure to repudiate the appointment. Judge D'Italia rejected defendants' contention that plaintiff was a temporary or interim tax assessor since he was never formally reappointed after his term expired on June 30, 1991, explaining that this theory contravened the legislative intent of *N.J.S.A.* 40:46–6.2 (now *N.J.S.A.* 40A:9–148), which requires fixed, four-year terms for tax assessors.

On August 13, 1993, Judge D'Italia entered an order declaring plaintiff the tenured tax assessor of Jersey City, and voided and vacated his removal. Subsequently, the judge directed defendants to establish an independent office of the city tax assessor, and declared invalid the portions of the city municipal code placing the tax assessor's office within the department of finance. The judge then directed plaintiff to proceed with the remaining causes of action in the complaint.[2]

I.

On appeal, Jersey City and Schundler essentially contend that the trial court usurped "the discretionary executive and

[2] On February 4, 1994, Judge D'Italia entered an order granting plaintiff partial summary judgment and directing defendants to recognize the tax assessor as an independent department. Defendants do not appeal from this order.

legislative functions of the mayor and city council" by reinstating plaintiff as tax assessor and granting him tenure.

Our careful review of the record in the light of the arguments advanced by the parties convinces us that defendants' arguments are clearly without merit. *R.* 2:11–3(e)(1)(E); *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). *See Ream v. Kuhlman,* 112 *N.J.Super.* 175, 270 *A.*2d 712 (App. Div.1970); *see also Cetrulo v. Byrne,* 31 *N.J.* 320, 323, 157 *A.*2d 297 (1960); *Johnson v. Hospital Serv. Plan,* 25 *N.J.* 134, 135 *A.*2d 483 (1957); *Barkus v. Sadloch,* 20 *N.J.* 551, 553, 120 *A.*2d 465 (1956). Accordingly, we affirm Judge D'Italia's August 13, 1993 order substantially for the reasons articulated in his oral decision of July 30, 1993. A tax assessor, unlike other municipal employees, must be independent and free from municipal interference and political pressure. Judge D'Italia's reinstatement of plaintiff with tenure was in accordance with this important public policy and the applicable legal principles.

## II.

Defendants moved for summary judgment on plaintiff's § 1983, LAD, CEPA, defamation, and punitive damage claims, as well as other claims not in issue on this appeal. Plaintiff submitted an opposing certification dated June 27, 1994, protesting the "continuous and overwhelming" harassment to which defendants have subjected him since his reinstatement, and the unfair and discriminatory treatment of him and his staff. Plaintiff complained about defendants' lack of cooperation and denial of resources, including expert appraisers, tax appeal attorneys, and office supplies and equipment. Plaintiff also submitted a transcript of a tape recording containing statements Schundler had made on a cable television call-in program on April 18, 1994 which Casamasino claims were defamatory. These are the statements:

> I will talk about the assessor whom I have been very publicly critical of ... we have a lot of questions about ... settlements that have been achieved with large property owners, large developers. Some of these settlements to us seem to have been a give away....in 1989 they indiscriminately ... jacked up ... commercial

property owner[s'] taxes, which is almost begging for appeal, but then they all suddenly settle with all these guys next year. That opens the door. I'm not going to make any accusations here, but that opens the door for someone to take pay offs ... one year you say I'm going to double your assessment but I'll give you a settlement, if tomorrow you come in and you give me the money. Now, I'm not going to say that any of this took place. But what I'm saying is, look at the way things are done, and it's just a wide open door inviting ... corruption. I don't think that you should have a settlement ... without some kind of independent assessment when you're talking about a large land.

Judge Gallipoli heard oral argument on July 22, 1994, and rendered an oral opinion, dismissing the portion of the complaints seeking punitive damages against Schundler in his official capacity.[3] The judge also dismissed the LAD claim, as well as the "intentional infliction of emotional distress" and "interference with business" claims which were not opposed in the Law Division. Additionally, the judge dismissed the CEPA claim, concluding there was no violation of any law, rule, or regulation because Schundler's proposal was never enacted and because plaintiff's objection was not to any "activity, policy or practice" as required by *N.J.S.A.* 34:19–3. However, Judge Gallipoli denied defendants' motion to dismiss plaintiff's defamation and § 1983 claims, directing plaintiff to plead the latter claim with more specificity. An order embodying these rulings was entered on August 3, 1994.

On August 25, 1994, plaintiff expanded his § 1983 claim by alleging that Schundler directed his staff to harass plaintiff, refused to recognize the tax assessor's office as independent, and refused to reimburse plaintiff for his legal fees pursuant to the council's resolution. Plaintiff further alleged that Schundler, "acting individually and beyond the scope of his official capacity," directed the withholding of pay increases and timely compensation for overtime and expenses for plaintiff and his staff; forced plaintiff to defend major tax appeals without appraisers; failed to provide office supplies and equipment to the assessor's office; removed an assistant corporation counsel from her assignment to defend tax appeals because Schundler perceived her as plaintiff's

---

[3] Plaintiff does not appeal from this dismissal.

ally; directed department heads to circumvent plaintiff and instead deal with his subordinates in matters concerning assessments and abatements of major properties; and excluded plaintiff from policy meetings involving property tax issues.

In February 1995, defendants again moved for summary judgment on plaintiff's remaining claims. On April 28, 1995, Judge Gallipoli heard oral argument and rendered an oral opinion, dismissing plaintiff's § 1983 claim involving Schundler's post-termination conduct. Regarding the § 1983 claim grounded on wrongful termination, the judge found that the mayor had "act[ed] in good faith" and concluded that plaintiff's proofs do "not substantiate ... [his] allegations" to the contrary. The judge determined the mayor believed "that he was acting legally" when he terminated the tax assessor whom he believed, on advice of counsel, to be a non-tenured employee. The judge reasoned that even assuming that plaintiff had a property right in his job, the proofs did not support the conclusion that Schundler had acted in knowing or reckless disregard of plaintiff's rights. The judge also dismissed the defamation claim, concluding that the statements Schundler made on the call-in cable television show were not susceptible of defamatory meaning, and were fair comment or personal opinion on a subject of public concern. Judge Gallipoli declined to decide the counsel fee issue arising from the Feigenbaum suspension, and directed plaintiff to apply to Judge D'Italia for relief on that claim. An order embodying these rulings was entered on May 10, 1995.

On July 6, 1995, Judge D'Italia entertained oral argument respecting the counsel fee issue and rendered an opinion. He declined to order the payment of plaintiff's counsel fees because the council had passed a resolution on May 24, 1995 rescinding the prior resolution, observing: "The municipality which gaveth could taketh away." He further concluded that since there was no certificate of encumbrance reflecting "money available in the budget to pay," as required by the ordinance, the resolution was not enforceable. The judge pointed out that plaintiff could have

moved "for an order of mandamus directing the [chief financial officer] to perform the required ministerial act" before the council passed the rescinding resolution, but was currently too late for such relief. On the same day, an order was entered memorializing his rulings.

Plaintiff filed a cross-appeal from the orders entered on August 3, 1994, May 10, 1995, and July 6, 1995. On January 6, 1996, on plaintiff's motion, this court consolidated defendants' appeal and plaintiff's cross-appeal.

On the cross-appeal, plaintiff argues that Judge Gallipoli erred in dismissing his § 1983 claim against Schundler; [4] his retaliatory discharge claim under CEPA, his common law wrongful termination claim, and his defamation claim because "genuine issues of material fact exist as to these claims." He also argues that Judge D'Italia erred in not "mandating the defendants to honor [the] resolution of the city council to reimburse plaintiff for the legal fees he incurred in the earlier suspension case."

### III.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2. To determine whether there is a genuine issue of material fact, the judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guard-*

---

[4] Plaintiff does not pursue his § 1983 claim against Jersey City. In any event, that claim against Jersey City is without merit since plaintiff's termination did not result from any official city policy. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 *U.S.* 658, 694, 98 *S.Ct.* 2018, 2037–38, 56 *L.Ed.*2d 611, 638 (1978); *Morgan v. Union Cty. Bd. of Chosen Freeholders,* 268 *N.J.Super.* 337, 363, 633 *A.*2d 985 (App.Div.1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994).

*ian Life Ins. Co.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). The judge must not decide the disputed fact, but must decide whether it is "a genuine issue for trial." *Ibid.* (citation omitted).

■ "To establish a claim under section 1983, a plaintiff must prove that the defendant acted under color of state law and that the defendant deprived the plaintiff of a federal statutory or constitutional right." *Kirk v. City of Newark,* 109 *N.J.* 173, 185, 536 *A.*2d 229 (1988). Plaintiff claims that he had a protected property right in his position under the Fourteenth Amendment, and that Schundler deprived him of that right by terminating him as tax assessor on June 30, 1993.

■ Judge Gallipoli assumed that plaintiff had a property right in his position as tax assessor but determined that Schundler did not act in knowing or reckless disregard of that right when he terminated plaintiff, concluding that Schundler "act[ed] in good faith in the belief that he was acting legally." Although such a finding of fact could not have appropriately been made on a motion for summary judgment, *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146, we conclude that Schundler is entitled to a qualified immunity from liability under § 1983 as a matter of law. Indeed, we are satisfied that a rational factfinder could not find that the mayor knew he was violating a clearly established right when he terminated plaintiff.[5] *Ibid.*

■ Officials are protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"; it is the "objective legal reasonableness" of the official's action that is determinative, *Anderson v. Creighton,* 483 *U.S.* 635, 638–39, 107 *S.Ct.* 3034, 3038,

---

[5] In so ruling, we are mindful that the availability of qualified immunity generally, when possible, should be decided on summary judgment. *See Kirk v. City of Newark, supra,* 109 *N.J.* at 182–185, 536 A.2d 229 (citing *Anderson, supra,* 483 *U.S.* at 646 n. 6, 107 *S.Ct.* at 3042 n. 6, 97 *L.Ed.*2d at 535 n. 6). *See also Hunter v. Bryant,* 502 *U.S.* 224, 228, 112 *S.Ct.* 534, 537, 116 *L.Ed.*2d 589, 596 (1991) ("Immunity ordinarily should be decided by the court long before trial.").

97 *L.Ed.*2d 523, 530 (1987) (quoting *Harlow v. Fitzgerald,* 457 *U.S.* 800, 819, 102 *S.Ct.* 2727, 2739, 73 *L.Ed.*2d 396, 411 (1982)).

> *[T]he right the official is alleged to have violated must have been "clearly established"* .... The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law *the unlawfulness must be apparent.*
>
> [*Anderson, supra,* 483 *U.S.* at 640, 107 *S.Ct.* at 3039, 97 *L.Ed.*2d at 531 (citations omitted) (emphasis added).]

*See Kirk v. City of Newark, supra,* 109 *N.J.* at 187, 536 *A.*2d 229; *McKinney v. East Orange Mun. Corp.,* 284 *N.J.Super.* 639, 648, 666 *A.*2d 191 (App.Div.1995), *certif. denied,* 143 *N.J.* 519, 673 *A.*2d 277 (1996); *see also Morgan v. Union Cty. Bd. of Chosen Free-holders,* 268 *N.J.Super.* 337, 362, 633 *A.*2d 985 (App.Div.1993) (observing that in order for the plaintiff to defeat defendant's claim of qualified immunity, "plaintiff must demonstrate that he possessed a clearly established right to be free from an adverse employment action motivated by political considerations"), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994).

Here, although plaintiff was ultimately successful in his quest for reinstatement and tenure, his right to such relief was not "clearly established" and, therefore, the unlawfulness of Schundler's removal of plaintiff as tax assessor was not so apparent as to deprive him of the qualified immunity.

■ Schundler maintained that he relied on the advice of corporation counsel, Sean Connelly, when he discharged plaintiff. According to the affidavits of Schundler and Connelly, Connelly advised that plaintiff was not tenured and could properly be dismissed because of "deficiencies in his appointment and failure to comply with provisions of the Faulkner Act." Plaintiff's attorney countered in a certification that the depositions of Schundler and Connelly indicated that neither had considered any legal memoranda with regard to plaintiff's termination, and points out a legal memorandum from July 1992 which concluded that permitting plaintiff to remain in office might be considered ratification by the council.

■ The existence of a single legal memorandum on the subject concluding that ratification might have occurred simply does not "clearly establish" plaintiff's right to tenure. Nor does Schundler's alleged late-night telephone conversation with Connelly, in which plaintiff alleges Connelly advised Schundler not to terminate plaintiff because it was "an improper discharge and it would subject [Schundler] and the City to a lawsuit," establish the impropriety of the removal. Even assuming this conversation occurred (it directly contradicts Connelly's affidavit as well as Schundler's), it does not show that plaintiff's right to tenure was sufficiently clear that a reasonable mayor would understand that firing the tax assessor would violate his constitutional rights.

In short, when Schundler made his decision to terminate plaintiff after talking to Connelly, although he must have been aware that his action was legally questionable, its unlawfulness was not "clearly established" or "apparent," but only a possibility. After all, Schundler's discharge of plaintiff had some legal support: The council had not formally confirmed plaintiff's appointment, and plaintiff was not formally reappointed when his term expired in 1991. Consequently, we are satisfied that it was objectively reasonable for Schundler to determine that he had the authority to terminate plaintiff. Stated another way, even crediting plaintiff's version of Connelly's opinion, a rational factfinder could not conclude that Schundler was certain that his termination of plaintiff was improper.

We also reject as without merit plaintiff's contentions that Schundler acted in bad faith when he terminated Casamasino, which we discuss more fully in connection with his common law wrongful termination claim. R. 2:11–3(e)(1)(E).

## IV.

■ Plaintiff objects to the dismissal of his claim under CEPA. He contends that he "blew the whistle" on the Mayor's proposal to implement a tax revaluation and reassessment plan in Jersey City in 1993 which he believed to be in contravention of state tax

guidelines. He maintains that the mayor fired him in retaliation for his public criticism of the plan at the council meeting on January 25, 1993.

*N.J.S.A.* 34:19–3 provides in relevant part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;

\* \* \*

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law[.]

Recently, our Supreme Court in *Abbamont v. Piscataway Township Board of Education,* 138 *N.J.* 405, 650 *A.*2d 958 (1994), discussed the purpose of CEPA as follows:

In 1986 the Legislature enacted CEPA to protect employees from retaliatory actions by employers. *That law protects "whistle blowers," "who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly 'blows the whistle' if the organization is involved in corrupt, illegal, fraudulent, or harmful activity."* ... When signing the whistleblower law, Governor Kean explained CEPA's purpose:

It is most unfortunate—but, nonetheless, true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer.

It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

[*Id.* at 417–18, 650 *A.*2d 958 (emphasis added) (citations omitted).]

In light of CEPA's articulated purpose, we conclude that plaintiff cannot prevail on his CEPA claim because he is not the type of employee the Act was intended to protect. In *Abbamont,* our highest court explained the public policy which CEPA was intended to effectuate: "[The Act] seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper and unlawful exercise of authority of employers." *Id.* at 418, 650 *A.*2d 958.

Plaintiff can hardly argue that he is the type of employee who harbored "deep-rooted fear . . . that his . . . livelihood [would] be taken away" if he [spoke] out against his employer's "activities, policies or practices." *See ibid.* Plaintiff is the tax assessor of Jersey City; as such he has tenure and can be removed only by the Director of the Division of Taxation, *N.J.S.A.* 54:1–36, or "by the Superior Court in an action brought therein by the Director of the Division of Taxation," *N.J.S.A.* 54:1–37. The fact that plaintiff might feel vulnerable in his position as tax assessor is immaterial. Plaintiff enjoys a unique, independent status as tax assessor due to his statutorily created job security. Indeed, plaintiff was not so intimidated by the mayor that he was unable to stand up at the city council meeting on January 25, 1993 and articulate his opposition to the mayor's tax plan. Nor was he so daunted by the mayor's alleged threats that he was rendered incapable of seeking and obtaining prompt judicial relief. Hence, we conclude that the Jersey City tax assessor is outside of CEPA's scope. We are satisfied that such a conclusion is fair and equitable, especially in light of the availability of exemplary damages under § 1983 had plaintiff's proofs been sufficient to justify such award.

Additionally, we feel constrained to add that we have some reservations as to whether the tax assessor's public criticism of the mayor's proposed tax revaluation and reassessment methods at a public forum convened for the very purpose of inviting public comment falls within the intendment of CEPA's "whistle blower" protection. We question, but do not resolve, the issue of whether plaintiff's public criticism of a proposal believed to be in violation of law should be likened to exposing or objecting to the "corrupt, illegal, fraudulent, or harmful activity" of an employer encompassed by the Act.[6] *See Abbamont, supra,* 138 *N.J.* at 417, 650 *A.*2d 958.

---

[6] Judge Gallipoli determined that CEPA did not apply because the mayor's plan was never implemented and, therefore, it was not an "activity, policy or practice" within the meaning of the Act.

## V.

██ We next consider plaintiff's contentions that Judge Gallipoli erred in dismissing his defamation claim based on Schundler's comments on the call-in cable television program. Schundler criticized the manner in which plaintiff reached settlements with large developers, asserting that plaintiff "indiscriminately" raised taxes in 1989, and then "suddenly" made settlements the following year. The mayor stated: "I'm not going to make any accusations here, but that opens the door for someone to take payoffs." Repeating that he was not saying "that any of this took place," he opined that "it's just a wide open door inviting corruption," concluding that there should be "some kind of independent assessment" before a settlement is made on a large property. Plaintiff asserts that "[t]he clear import of the statement was that he was taking payoffs" and the statements were "accusations of criminal behavior by the assessor" and are therefore defamatory. We disagree.

 "Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." *Ward v. Zelikovsky*, 136 *N.J.* 516, 529, 643 *A.*2d 972 (1994) (citing *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67, 444 *A.*2d 1086 (1982)). In determining whether statements are defamatory, the court "must consider the content, verifiability, and context of the challenged statements." *Id.* at 529, 643 *A.*2d 972. Additionally, the court should look " 'to the fair and natural meaning which will be given [the alleged defamatory statement] by reasonable persons of ordinary intelligence.' " *Ibid.* (quoting *Romaine v. Kallinger*, 109 *N.J.* 282, 290, 537 *A.*2d 284 (1988)). Nonetheless, if the alleged defamatory statement is an opinion which discloses all of the facts on which the opinion is based, even the most derogatory or unreasonable opinion is not actionable because "readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." *Kotlikoff, supra*, 89 *N.J.* at 72–73, 444 *A.*2d 1086 (citations omitted).

Applying these principles here, we are convinced that the fair and natural meaning of the mayor's remarks is that he was offering an opinion critical of the process employed by plaintiff, not accusing plaintiff of wrongdoing. Schundler twice specified that he was not making any accusation, and we perceive nothing in the context of the statement or the situation in which it was spoken to indicate that Schundler's denial should not be taken at face value. "Taken as a whole," Schundler did not accuse plaintiff of criminal activity, and the terms "payoffs" and "corruption" were merely rhetoric and hyperbole. *See id.* at 72, 444 *A.*2d 1086. Additionally, Schundler disclosed all of the facts on which he based his opinion, thereby rendering them capable of objective verification. Schundler described the alleged existing method of increasing taxes on commercial properties and entering into settlements the following year. Hence, his opinion that this system "opens the door" to corruption and payoffs was not based on any undisclosed or assumed facts; this was the mayor's "pure opinion."

Accordingly, we agree with Judge Gallipoli that Schundler's comments were protected opinion on a matter of public concern. In so ruling, we are mindful of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 73, 444 *A.*2d 1086 (quoting *New York Times v. Sullivan,* 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 720, 11 *L.Ed.*2d 686, 701 (1964)). It is also far from clear that plaintiff, as a public figure himself, could meet the "actual malice" standard established and defined in *New York Times v. Sullivan, supra,* 376 *U.S.* at 282–83, 84 *S.Ct.* at 727, 11 *L.Ed.*2d at 708–09, and its progeny.

## VI.

Plaintiff next argues that his wrongful termination claim against Schundler was improperly dismissed. He contends that since Schundler acted in bad faith, he is liable for punitive damages. We disagree.

Plaintiff has failed to raise a genuine factual issue in respect of Schundler's good or bad faith. Weighing the evidential materials, and viewing them favorably to plaintiff, a rational factfinder could find only that Schundler disagreed with plaintiff on policy matters relating to tax assessment, disliked plaintiff apparently for this reason, wanted plaintiff removed from office, failed to cooperate in supplying his needs, and discharged plaintiff despite a question as to the legality of doing so. There is no evidence of any personal reasons for Schundler's animosity toward plaintiff. We are satisfied that any malice Schundler had toward plaintiff does not approach the degree of wrongdoing required for an award of punitive damages.

> To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act.
>
> [*Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 49, 477 *A.*2d 1224 (1984) (citations omitted).]

Here, the intentional act was Schundler's discharge of plaintiff. Other than job-related conflict between the two resulting in some animosity on Schundler's part, there is no evidence that the discharge of plaintiff was "evil-minded" or accompanied by a wanton and willful disregard of plaintiff's rights. Although the propriety of discharging plaintiff was questionable at the time, a rational factfinder could not conclude that Schundler acted in a malicious or wantonly reckless manner. In short, plaintiff's claim of punitive damages against Schundler was properly dismissed.

## VII.

Lastly, we reject plaintiff's contention as clearly without merit that Judge D'Italia erred in denying his claim for reimbursement of the counsel fees in the amount of $8,079.14 awarded under the resolution of April 7, 1993. *R.* 2:11–3(e)(1)(E). However, we deem it appropriate to comment briefly. While plaintiff is correct that Judge D'Italia was mistaken when he said that plaintiff should have moved for an order compelling the chief

financial officer to encumber the funds before the council passed the rescinding resolution since that is, in fact, what he did,[7] we nevertheless disagree with plaintiff's contention that the resolution is void. Plaintiff cites no authority for the proposition that a municipal council may not rescind a resolution. Nor has plaintiff alleged any reliance on the original resolution to justify voiding the subsequent resolution. Moreover, plaintiff has not identified any statutory protection affording relief against the council's rescinding of the initial resolution. Thus, despite the adverse result for plaintiff, we perceive no error in Judge D'Italia's holding that "the municipality which gaveth could taketh away." Notably, the rescinding resolution does not prohibit any future action of the council to resolve to reimburse plaintiff for his attorney's fees.

## VIII.

Accordingly, we affirm the order dated August 13, 1993 on the appeal and affirm the orders dated August 3, 1994, May 10, 1995 and July 6, 1995 on the cross-appeal.

---

[7] The initial resolution was passed on April 14, 1993. Plaintiff filed his complaint on July 1, 1993, demanding that defendants be directed "to immediately comply" with the resolution. The rescinding resolution was passed on May 24, 1995, the day before Schundler's attorney submitted his certification in support of his motion for summary judgment on this issue.